UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ASTRO-MED, INC., Plaintiff, | : | |
| vs. | : | C.A. No. 06-533 ML |
| KEVIN PLANT, Defendant. | : | |

**PLAINTIFF'S POST-HEARING MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Astro-Med, Inc. ("Astro-Med") submits this Post-Hearing Memorandum in support of its Motion for Preliminary Injunction against Defendant Kevin Plant ("Plant"). At the evidentiary hearing conducted on December 27 and 28, 2006, Astro-Med presented the testimony of Plant, Marc Paliotta ("Paliotta"), Clinical Products Manager for Grass-Technologies, a division of Astro-Med, Marco Mancini ("Mancini"), Astro-Med's Worldwide Sales Manager, and Everett Pizzuti ("Pizzuti"), President of Astro-Med. Plant did not present a case or offer a single exhibit. The testimony of these witnesses and the documents in evidence establish conclusively that Plant has violated the non-compete and non-disclosure provisions of his Employee Agreement with Astro-Med, Plant possesses and threatens to misappropriate Astro-Med's trade secrets and other confidential information and that Astro-Med is entitled to preliminary injunctive relief.

## I. Proposed Findings of Fact

1. In July 2002, Kevin Plant applied for a Product Specialist position at Astro-Med. (December 27, 2006 Testimony of Kevin Plant ("Plant Test.").)

2. At the time of his application, Plant was working at a company in New Jersey called *Organize it All,* selling home organizational products to retailers and catalogues and made $41,000 per year. (Plant Test.)

3. Plant had no experience marketing or selling medical equipment, including electroencephalographs (EEG), polysomnographs (PSG), or long-term monitoring for epilepsy (LTM) equipment. (Plant Test.)

4. Plant learned about the position at Astro-Med through an advertisement for a Product Specialist position for the Grass Technologies division ("Grass"), as well as from his father, who was at the time and is today, an employee of Astro-Med. (Plant Test.)

5. The requirements for the Product Specialist position included: travel throughout the United States; providing sales assistance to Astro-Med customers; developing marketing material; developing training manuals; providing technical sales support; and providing product demonstrations and training for the Grass field sales force. (Plant Test.; Ex. 3.)

6. Plant did not present himself to Astro-Med as possessing any specialized skills or other unique qualifications. (Plant Test.)

7. Astro-Med hired Plant, and he began work on October 16, 2002. On that date, he signed an Employee Agreement with Astro-Med. (Plant Test.; Ex. 4.)

8. Signing the Employee Agreement was a condition of Plant's employment at Astro-Med. (December 28, 2006 Testimony of Everett Pizzuti ("Pizzuti Test."); Plant Test.).)

9. During his four year career at Astro-Med – roughly divided between his Product Specialist and District Manager positions – Plant never told the management at Astro-Med that he considered the Employee Agreement to be unenforceable. (Plant Test.)

10. Plant signed the Agreement in advance of any salary from Astro-Med or any training in EEG, PSG, or LTM medical equipment. In addition, Astro-Med did not expose Plant to prospective customers, internal pricing, or research and development initiatives until after he signed the Agreement. (Plant Test.; December 27, 2006 Testimony of Marc Paliotta ("Paliotta Test.").)

11. All Product Specialists and sales people at Astro-Med are required to sign Employee Agreement. (Pizzuti Test.; December 27, 2006 Testimony of Marco Mancini ("Mancini Test."); Paliotta Test.)

12. The Employee Agreement contains a one-year non-compete clause. It also contains a non-disclosure of confidential information clause that continues in perpetuity. (Ex. 4.)

13. The Employee Agreement's one-year non-compete provision is critical to:

- Protect Astro-Med's proprietary information;
- Protect the goodwill developed with customers and prospective customers;
- Allow time for a replacement to renew relationships without competition; and
- Protect Astro-Med from unfair and predatory competition from its competitors.

(Pizzuti Test.)

14. Shortly after joining Astro-Med, Astro-Med enrolled Plant in a training program, which educated him about Astro-Med's product line of EEG's, PSG's and LTM

equipment, including its newest products, the AS40 Comet system and the TWin v. 3.0 software. (Plant Test.; Ex. 5.)

15. Astro-Med also trained Plant on, and exposed him to, the Company's J.D. Edwards program. This is a password protected, proprietary database that contains, among other data, sales, billing, engineering, supply, demand, credit check, pricing and technical support information. Astro-Med restricts the number of employees who have access to this database. (Plant Test.; Paliotta Test.; Ex. 6.)

16. Astro-Med's Grass® product line is sold throughout the United States and Europe, an area co-extensive with the geographic scope of the non-compete provision in the Employment Agreement. (Plant Test.)

17. Astro-Med invested heavily in Plant's training and development in the specialized field of capital medical equipment. It sent Plant on installations at customer sites throughout the United States. He traveled with technical support to learn the intricacies of Astro-Med's hardware and software packages. He traveled with experienced sales representatives to learn and understand customer preferences and selling techniques. At Plant's periodic reviews, his supervisors encouraged these exposures through site visits. He also worked with the engineering department in West Warwick on the development of new products. (Plant Test.; Exs. 7, 8.)

18. Over time, Plant became facile with the Grass product line and developed an excellent working relationship with its technical support group. He became involved with the testing and implementation of the TWin 3.x software under development. Among his Product Specialist peer group, Astro-Med selected Plant alone to assist in the development of the "ADAM" project, a secret product under development. (Plant Test.)

19. Plant helped prepare manuals to train other Product Specialists and salespeople. In fact, a photograph of Plant appears in training material for Astro-Med's AURA 24 Ambulatory EEG System. (Ex. 15B, p. 8.)[1]

20. After approximately two years as a Product Specialist, Plant requested and received a promotion to District Manager in the newly-vacant Southeastern territory, which at the time covered Florida, Georgia, South Carolina, Alabama and Tennessee. The District Manager position at Astro-Med equates to a regional salesperson. (Plant Test.)

21. Plant had no prior experience selling capital medical equipment in the Southeast.

22. At the time of his promotion, Plant's supervisor notified him that the territory would be divided in the future. (Mancini Test.)

23. Astro-Med paid Plant's relocation expenses to Florida. It also paid for his continuing education toward a college degree. (Plant Test.)

24. Astro-Med provided Plant with a compilation of customer leads for the Southeastern territory. (Plant Test.; Mancini Test.)

25. Astro-Med generates customer leads as a result of its investment at tradeshows, industry advertising, mailings, incoming calls to headquarters, and Internet advertising. The leads are constantly updated and forwarded to the salespeople in the field. Only a small percentage of the leads are generated through cold calls. (Plant Test.; Mancini Test.; Exs. 9, 10, 11.)

---

[1] This is the same product-type that Plant testified he later sold for Nihon Kohden.

26. As a salesperson, Astro-Med gave Plant access to proprietary customer lists, marketing techniques and information, sales training, and pricing information. (Plant Test.; Mancini Test.; Paliotta Test.; *see also* Exs. 9, 10, 11, 15N, 17, 18, 20.)

27. Astro-Med conducts national sales meetings. In June 2006, for example, Astro-Med exposed Plant to its newest products and research and development efforts, including: Advanced EKG Analysis; the new TWin Database; the Beehive Horizon and AURA24; the SleepTrek™ Portable Sleep Screener; and Astro-Med's Active LTM and EEG research and development projects. (Exs. 15I – 15N; Plant Test.; Paliotta Test.)

28. Several of these products had not yet been released to the public (and still have not been released). (Paliotta Test.; Ex. 15N.)

29. The agenda for these sales meetings for 2005 and 2006 also included training on marketing and selling Astro-Med's products, including: selling points for the AURA-PSG; demonstration strategies for the TWin Databases and Patient Scheduler; and PSG specific product training. (Ex. 16; Plant Test.; Paliotta Test.)

30. Astro-Med facilitated at these meetings – attended by Plant – in-depth discussions about the strength and weaknesses of Astro-Med's products, as well as those of its competitors' products, including those of Nihon Kohden. (Ex. 17 ("Competition Review"); Plant Test.; Paliotta Test.)

31. Astro-Med's Grass products are not sold at list price; pricing is based on an amalgam of strategic considerations and is an important means of gaining a competitive advantage in the medical neurology marketplace. (Mancini Test.; Plant Test.)

32. The final price of a product is based on a strategy formed by several variables, including the competitive situation, the likelihood of future sales, and whether a prospective client is a high-profile target such as a major university or metropolitan hospital. These factors, and the application of those factors in setting the price, is information that is proprietary and confidential to Astro-Med. (Plant Test.; Mancini Test.)

33. Plant consulted with his sales manager, Mr. Mancini, before negotiating final prices with customers. (Mancini Test.; Plant Test.)

34. To illustrate this point, Plant consulted with Mr. Mancini as to pricing for a customer who was also considering products from two of Astro-Med's competitors: Respironics and Nihon Kohden. (Plant Test.; Mancini Test.; Exs. 19, 20.)

35. During his four years at Astro-Med, Plant gained specialized, technical knowledge as to the marketing, development, pricing and selling of EEG's, PSG's and LTM equipment. (Plant Test.; Paliotta Test.)

36. For the first nine months of 2006, Astro-Med paid Plant $123,000, over three times his salary as a salesperson in his last full year before he joined Astro-Med. (Plant Test.)

37. As a result of Astro-Med's investment in his specialized training, Plant became marketable as a salesperson of capital medical equipment. (Plant Test.)

38. On September 21, 2006 Plant gave notice to Astro-Med that he was quitting. On September 21, 2006, Mr. Mancini asked Plant if he was going to work for a competitor. At the time, Plant was visiting Astro-Med customers in Florida. Plant denied that he was leaving to work for a competitor. (Mancini Test.)

39. After giving notice of his departure, Mr. Pizzuti reminded Plant in writing of his obligations under the Employee Agreement. Plant responded that he had consulted an attorney and was aware of his obligations. (Plant Test.; Exs. 12, 13)

40. Unbeknownst to Astro-Med, Plant first met with Nihon Kohden in early September, 2006. According to Plant, he advised Nihon Kohden of the non-compete and non-disclosure clauses in his Employment Agreement; nevertheless, Nihon Kohden hired him as a sales representative in Florida, selling the same equipment as he sold for Astro-Med. (Plant Test.)

41. Nihon Kohden competes directly with Astro-Med in the sale of EEG, PSG and LTM products. (Plant Test.; Mancini Test.) Nihon Kohden also sells capital medical equipment in Florida and elsewhere that does not compete with Astro-Med's Grass® product line, such as cardio equipment. (Plant Test.)

42. Plant joined Nihon Kohden with full knowledge of the obligations of his Employee Agreement and advised Nihon Kohden that he was subject to the Agreement. (Plant Test.)

43. The neurophysiological medical equipment market in which Astro-Med competes with Nihon Kohden is a specialized and limited market. (Mancini Test.; Pizzuti Test.)

44. Astro-Med competes against approximately nine other competitors with a market size of approximately $250 million in annual gross sales. (Mancini Test.; Pizzuti Test.)

45. In this market, Astro-Med attempts to distinguish itself by generating detailed customer information, competitive pricing strategies, competitive marketing strategies and the specialized training of its sales force. (Mancini Test.)

46. Because customers may only purchase this equipment once every few years, it is important to establish long-term relationships with current and prospective customers and maintain goodwill. (Mancini Test.; Pizzuti Test.)

47. Astro-Med's sales personnel are the face of the company, and are the ones who establish and maintain goodwill with customers. (Mancini Test.)

48. At the time of his departure, Plant was Astro-Med's only sales representative in the revised Southeast region composed of Florida, Alabama and Southern Georgia. (Plant Test.) As a result of Plant's departure, Astro-Med lost its most direct means of contact with its customers. (Mancini Test.)

49. It will take at least a year for Plant's replacement to restore the goodwill and relationships with Astro-Med customers. (Mancini Test.; Pizzuti Test.)

## II. Proposed Conclusions of Law

Astro-Med must satisfy four elements for a preliminary injunction to issue against Plant: (1) a demonstration of the likelihood of success on the merits of its claims; (2) irreparable harm to Astro-Med if injunctive relief is denied; (3) that the balance of the equities favors Astro-Med; and (4) preservation of the status quo. *See Leone v. Town of New Shoreham*, 534 A.2d 871, 873 (R.I. 1987). Astro-Med need only show a "reasonable probability rather than a certainty of ultimate success on a final hearing" to be entitled to preliminary injunctive relief. *See Coolbeth v. Berberian*, 313 A.2d 656, 660 (1974).

A. Astro-Med Will Likely Succeed On The Merits Of Its Breach Of Contract And Threatened Misappropriation Of Trade Secrets Claims.

Astro-Med established the enforceability of the Employee Agreement and Plant's violation of its non-compete and non-disclosure provisions. The parameters of an enforceable non-compete provision are not disputed. Applying *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1053 (R.I. 1989), Astro-Med has the burden to show that: (1) the non-compete provision is ancillary to an otherwise valid employment relationship; (2) the provision is supported by adequate consideration; (3) the provision protects Astro-Med's legitimate business interests; and (4) the provision is reasonable in time and scope. A similar analysis is applied for the non-disclosure provision, which will also be enforced if reasonable in scope and purpose. *See Nestle Food Co. v. Miller*, 836 F. Supp. 69, 76-77 (D.R.I. 1993).

1. The Provisions are Ancillary to Plant's Employment with Astro-Med.

The non-compete and non-disclosure provisions of Plant's Employment Agreement are ancillary to his employment with Astro-Med. Plant signed the Agreement on the day he joined Astro-Med and the provisions of the Agreement are part of Plant's overall employment relationship with Astro-Med. *See Cranston Print Works Co. v. Pothier,* 848 A.2d, 213, 200 (R.I. 2004).

2. Plant's Employment and Training Constitute Adequate Consideration for the Agreement.

Employment is valid consideration to support covenants in an employment agreement under Rhode Island law. *Nestle*, 836 F. Supp. at 77.

Astro-Med conditioned Plant's employment on his signing the Employee Agreement. (Plant Test.; Pizzuti Test.) All Product Specialists and District Sales Managers must sign the same Employee Agreements. (Pizzuti Test.; Paliotta Test.; Mancini Test.) Plant did not

receive any compensation, training or access to Astro-Med's confidential information until he signed the Agreement. (Plant Test.) This is consistent with the introductory paragraph of the Agreement that states that the employee agrees to the provisions of the Agreement in exchange for employment at Astro-Med and compensation for that employment. (Ex. 4.) Thus, the Employee Agreement is supported by adequate consideration.

3. The Provision Protects Astro-Med's Legitimate Business Interests.

a. Astro-Med Specially Trained Plant

Enforceable non-compete and non-disclosure provisions must be designed to protect legitimate business interests. *See Nestle*, 836 F. Supp. at 74; *see also Durapin*, 559 A.2d at 1053. Specialized or unique training is a legitimate business interest, and a non-compete provision may be enforced to prevent a specially trained employee from using that training in his or her work for a competitor. *See Dial Media, Inc. v. Schiff*, 612 F. Supp. 1483, 1489 (D.R.I. 1985).

In October 2002, Plant joined Astro-Med with no experience in medical equipment or the marketing or selling thereof. He left the company after receiving four years of training and experience, and in the interim became a top salesperson at Astro-Med. (Plant Test.) His salary increased threefold from when he sold home organizing products prior to joining Astro-Med.

As a Product Specialist, Astro-Med introduced Plant to, and trained him on, the Grass® EEG, PSG and LTM products. (Plant Test.; Paliotta Test.; Ex. 5.) Astro-Med provided Plant with training on, and access to, the J.D. Edwards Database. (Plant Test.; Paliotta Test.; Ex. 6.) He performed product demonstrations for sales personnel and attended installations at customer sites. (Plant Test.; Paliotta Test.) Plant's specialized training

continued as a District Sales Manager. He learned to demonstrate and sell the Grass product line. (Plant Test.) He attended annual or biannual national sales meeting and Astro-Med trained him on new and existing products sales techniques and its competitors' products. (Ex. 16; Plant Test.; Paliotta Test.)

Throughout his employment, Astro-Med exposed Plant to its proprietary and confidential product information, pricing and marketing techniques and customer lists. (Paliotta Test.; Mancini Test.; Ex. 15A-N; Ex. 9-11; Ex. 19, 20.) Astro-Med specially trained Plant as a Product Specialists and District Manager.

b. Astro-Med Vested Plant with Confidential Business Information

Confidential business information is a legitimate business interest to protect if it is of the type that is not readily ascertainable through independent means. *Home Gas Corp. of Massachusetts v. DeBlois Oil Co.*, 691 F. Supp. 567, 574 (D.R.I. 1987). The Employment Agreement's non-compete and non-disclosure provisions also protect Astro-Med's proprietary and confidential business information from disclosure to a competitor. *See Nestle*, 836 F. Supp. at 74.

i. Confidential Product Testing and Development

Plant began his employment with Astro-Med as a Product Specialist. His job duties included product demonstrations and training for the Grass Technologies sales force, developing training manuals and attending installations and demonstrations at customer sites. (Plant Test.; Ex. 3.) Plant's role evolved to include product testing and liaising with the research and development department. Plant trained on Astro-Med's newest products, the AS40 and the TWin v3.0 software. (Ex. 5; Paliotta Test.; Plant Test.) He participated in alpha and beta testing of software. (Plant Test.) Astro-Med selected him as the only Product

Specialist to participate in the "ADAM" project, a secret product then under development at Astro-Med. (Plant Test.)

Plant continued to receive product development information from Astro-Med upon his promotion to District Manager. Plant attended annual sales meetings, such as the June 2006 sales training meeting, where Astro-Med exposed him to upcoming product releases and products under development. (Paliotta Test.; Exs. 15G – 15L.) Exhibit 15G, for example, contains detailed product and pricing information about the AURAPSG-LITE product, which had not been released at that time. (Paliotta Test.) Astro-Med's strategies in developing Advanced EEG Analysis products and marketing those products to clients were presented. (Ex. 15H.) Astro-Med exposed Plant to the new TWin Database Explorer and Patient Scheduler (Exh. 15I); the new TWin Database Editor (Exh. 15J); a Fully Automated Sleep Stager (Exh. 15K); the Beehive Horizon and AURA24 (Exh. 15L); the SleepTrek® Portable Sleep Screener (Exh. 15M); and active research and development projects for LTM and EEG products (Exh. 15N) that have yet to be released to this day. (Plant Test.; Paliotta Test.)

This product information, testing and development efforts are confidential business information and proprietary to Astro-Med.

ii. Confidential Pricing and Marketing Information and Strategies

Astro-Med has developed proprietary marketing and pricing techniques, and protecting this information is critical to Astro-Med in maintaining market share in a field of only nine other competitors. (Mancini Test.) The ultimate sales price of the Grass line of products is not the list price. (Plant Test.; Mancini Test.) Actual prices to customers are determined by an analysis and application of several factors: the competitive environment; the likelihood of future sales; and the profile of the client. (Plant Test.; Mancini Test.) This

pricing strategy and the application of this strategy in setting the ultimate price is proprietary to Astro-Med. (Mancini Test.) Astro-Med involved Plant directly and intimately in competitive pricing, as illustrated by his e-mail correspondence with Mr. Mancini. (Exs. 19, 20.) In fact, Mr. Mancini and Plant engaged in this pricing discourse to compete against Nihon Kohden on a potential sale. (Ex. 19; *see also* Ex. 20.)

With respect to marketing, Plant was present for specific discussions as to the demonstration and sales of Astro-Med products, how Astro-Med could sell its products more effectively, and on-going discussions, meetings and memoranda about the strength and weaknesses of the Grass® product line in comparison to its competitors' products. (Exs. 16, 17, 18.) Astro-Med treated this information as proprietary and confidential. The depth and breadth of the discussion about Astro-Med's EEG products would be enormously valuable to a competitor such as Nihon Kohden. (Paliotta Test; Pizzuti Test.)

iii. <u>Customer Lists</u>

"Equitable protection will be provided against the competitive use of a list of customers which is confidential in nature." *Home Gas Corp.*, 691 F. Supp. at 574. A customer list is considered confidential if it could not be readily obtained by a person conducting an independent investigation, or the information is not otherwise publicly available. *See Id.* at 574-575; *see also Nestle*, 836 F. Supp. at 74-75; *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 193 (R.I. 1984).

Astro-Med's customer databases are compiled through Astro-Med's advertising in trade journals, attendance at trade shows, contacts in the field, mailings, Internet advertising, and incoming calls to its Rhode Island headquarters. (Mancini Test.) "Cold calls" represent a small portion of the customer contacts. (Mancini Test.; Exs. 9-11 (*see* "Source" column).)

The database is an organic document, updated as new information becomes available through company sources. (Mancini Test.) Astro-Med likely gave Plant the compilation of the customer database for his region when he was sent there and consistently fed him with new leads generated from the company's marketing efforts. (Plant Test.; Mancini Test.) Astro-Med developed its customer leads and maintained them through its own efforts and not from widely available sources. *See Home Gas Corp.*, 691 F. Supp. at 574-575; *cf. Nestle,* 836 F. Supp. at 75 (noting that the customer information at issue was a known quantity and readily obtainable by other in the industry). Astro-Med's customer lists are confidential information. (Exs. 9, 10, 11.)

4. The Limitations Imposed are No More than is Necessary to Protect Astro-Med's Interests.

- As the court noted in *Nestle*, a party seeking enforcement of a non-compete clause must demonstrate that the restrictive covenants go no further than necessary to protect the employer's legitimate business interests. *See Nestle,* 836 F. Supp. at 75. A one-year limitation is reasonable if it would take that long to minimize the loss of an employee with extensive product training. *See Hekimian Labs v. Domain Sys., Inc.*, 664 F. Supp. 493, 498 (S.D. Fla. 1987); (*see also* Pizzuti Test.)

Employee agreements are vital to protecting Astro-Med's confidential business information and preventing that information from going to a competitor. (Pizzuti Test.) It is uncontroverted that it will take at least a year to allow Plant's replacement to re-establish relationships with customers once that person is in place. (Mancini Test.) Further, given Plant's extensive knowledge of Astro-Med's products, it is imperative that he be prevented from unfairly providing that information to competitors. *Nestle*, 836 F. Supp. at 77; (Pizzuti Test.).

A broad geographic limitation is also appropriate when the former and current employers compete internationally. *Id.* Imposing a narrow geographic restriction in such a competitive situation provides an incomplete remedy to the former employer; the current employer could simply transfer the employee to another region where he could compete just as effectively and unfairly. *Id.* (*see also* Pizzuti Test.)

Moreover, Astro-Med exposed Plant to customer sites throughout the country as a Product Specialist. In fact, his job description required travel throughout the United States, and he did just that. (Exs. 3, 7, 8; Plant Test.) Astro-Med and Nihon Kohden compete in a specialized, worldwide market. The EEG, PSG and LTM market is relatively small, totaling approximately $250 million in annual sales. (Mancini Test.) Further, as Plant's own experience shows, a salesperson armed with Astro-Med's specialized training and support could be placed and succeed in any territory. Astro-Med placed Plant in Florida without any prior exposure to that market, and he quickly rose to be the number two producer in the country. Similarly, Nihon Kohden could place him anywhere. Imposing a limited geographic restriction in this instance would render the non-compete clause infirm. (Pizzuti Test.)

5. Astro-Med has Established the Threatened Misappropriation of its Trade Secrets.

Astro-Med also established Plant's threatened misappropriation of Astro-Med's trade secrets, in violation of R.I. Gen. Laws § 6-41-1 *et seq,* Rhode Island's Uniform Trade Secrets Act (the "Act"). Under the Act, a trade secret is information, such as a compilation, program, method, technique, or process that derives independent economic value from not being generally known to, or readily ascertainable by, other persons who can obtain economic value from its disclosure or use. R.I. Gen. Laws. § 6-41-1(4)(i). The trade secret must be the subject of reasonable efforts to maintain its secrecy. R.I. Gen. Laws. § 6-41-1(4)(ii).

Misappropriation is defined as the use or disclosure of a trade secret by a person who acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use. R.I. Gen. Laws. § 6-41-1(2). The Act provides for injunctive relief to protect a company's trade secrets from actual or threatened misappropriation. R.I. Gen. Laws. § 6-41-2.

Astro-Med has established the proprietary nature of its products under development, marketing, pricing and customer information. (Plant Test.; Paliotta Test.; Mancini Test.; Pizzuti Test.) The value of these trade secrets is critical to Astro-Med's success in a small, specialized market, and would be enormously beneficial to a competitor like Nihon Kohden. (Pizzuti Test.) Astro-Med exposed Plant to its trade secrets while he was subject to the non-compete and non-disclosure provisions of his Employee Agreement. Astro-Med is now faced with the threatened, if not actual,[2] misappropriation of the trade secrets it imparted to Plant.

B. Astro-Med Will Suffer Irreparable Harm If The Injunction Is Not Granted.

Astro-Med faces the loss of goodwill and the prospect of a direct competitor having an unfair advantage through access to Astro-Med's proprietary information. *Nestle*, 836 F. Supp. at 77; (*see also* Pizzuti Test.) Goodwill is the special relationship established between a salesperson such as Plant and the employer's customers, and is an asset of Astro-Med's. Its sales of the Grass® line of capital medical equipment is the result of a significant investment by the company in establishing and fostering customer relationships. (Mancini Test.) Customers may only purchase this equipment once every several years. (Mancini Test.)

---

[2] Plant denies that he used any confidential information obtained from Astro-Med in his employment with Nihon Kohden. (Ex. 24 at ¶ 7.) This assertion cannot be taken at face value in light of the testimony showing that several of Plant's assertions in his affidavit were false, and that Plant denied that he was going to work for a competitor at the time of his departure from Astro-Med. Regardless, the Act protects against the threatened misappropriation of trade secrets.

Therefore, the goodwill between Astro-Med's sales representatives and current and future customers is critical to the success of the company. It will take at least a year for a replacement to get up to speed in Plant's territory. (Mancini Test.) It may take far longer to re-establish strong relationships with Astro-Med's customers, because Astro-Med is now "blind" in the Florida market. (Mancini Test.)

Further, Astro-Med's competitor, Nihon Kohden, through Plant, now has access to Astro-Med's proprietary product information as well as its marketing and sales strategies, placing Astro-Med at a severe competitive disadvantage. Astro-Med, Nihon Kohden, and approximately eight other companies are competing directly for a share of a market with $250 million in gross sales. (Pizzuti Test.; Mancini Test.) To succeed, Astro-Med has made a considerable investment in the development, marketing and sale of its products. (Mancini Test.) If Plant is permitted to use the knowledge he obtained at Astro-Med for his new employer, Astro-Med faces the prospect of losing any advantage it might have gained through its efforts.

C. The Balance Of The Equities Favors Astro-Med.

Plant joined Astro-Med with no experience in medical neurology and sleep science products. (Plant Test.; Paliotta Test.) Astro-Med thoroughly trained Plant in product nomenclature and pricing, gave him a key role in product development, and provided him with access to Astro-Med's confidential sales information. (Plant Test.; Paliotta Test.; Exs. 5, 6, 15A-N.) He benefited significantly from this training. Upon promotion, Plant's region became the number two sales region in the country and, as a result, Plant's compensation more than tripled since joining Astro-Med. (Plant Test.; Mancini Test.) Astro-Med paid for his relocation expenses to Florida and some of his college education. (Plant Test.)

Plant signed his Employee Agreement as a condition of his employment and never told Astro-Med that he would disregard its essential provisions. (Plant Test.) He left Astro-Med with full knowledge of his obligations under the Agreement, (Exs. 12, 13), yet went to a direct competitor selling the exact same products. He informed Nihon Kohden about the Employee Agreement. (Plant Test.) His gamble did not pay off and in the process, he damaged the company that is, in many ways, responsible for his present marketability. The equities favor Astro-Med.

D. Injunctive Relief Will Restore The Status Quo.

Astro-Med only seeks to return to the position wherein its competitor does not have access to its proprietary information and trade secrets, and one of its former salespeople is not competing directly against it in the discrete field of EEG, PSG and LTM product sales.

## III. Conclusion

For all the foregoing reasons, and in light of the testimony elicited and exhibits introduced at the evidentiary hearing, Astro-Med respectfully requests that this Court grant its Motion, and preliminarily enjoin Plant from unfairly competing against Astro-Med as follows:

(1) Engaging in any marketing or sales activity on behalf of Nihon Kohden America, Inc., and all its affiliates and those in concert with it, with respect to the offering for sale or selling electroencephalograph (EEG), polysomnograph (PSG), or long-term monitoring for epilepsy (LTM) equipment, and related products, within the United States for a period of one year from the date of the Court's Interim Injunction Order of December 28, 2006; and

(2) Disclosing any proprietary or confidential information acquired during his employment at Astro-Med, Inc., including research and development information, customer and prospect lists, and pricing strategies.

Respectfully submitted,

ASTRO-MED, INC.

/s/ Craig M. Scott

Craig M. Scott, Esq. (# 4237)
Robert J. O'Keefe, Esq. (#6750)
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-telephone
(401) 455-0701-facsimile
cscott@duffysweeney.com

January 5, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that the within ***Plaintiff's Post Hearing Memorandum in Support of its Motion for Preliminary Injunction*** was filed through the ECF system on the 5th day of January, 2007, and will be sent electronically to counsel named below who are registered participants identified on the Notice of Electronic Filing or as indicated below:

Michael A. Gamboli, Esq.
Lisa M. Martinelli
Partridge Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

*Via First Class Mail:*
**Benjamin L. Kennedy**
**E. P. Michael Karcis**
McLean & McLean LLP
3001 2nd Street, Suite E
Santa Monica, CA 90405

/s/ Craig M. Scott