IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.A. NO. 06-533ML

ASTRO-MED, INC.

VS. DECEMBER 27, 2006
10:00 A.M.

KEVIN PLANT

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

DISTRICT JUDGE

(Preliminary Injunction Hearing)

APPEARANCES:

FOR THE PLAINTIFF: CRAIG M. SCOTT, ESQ.
ROBERT J. O'KEEFE, ESQ.
Duffy, Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

FOR THE DEFENDANT: E.P. MICHAEL KARCIS, ESQ.
McLean & McLean, LLP
3001 2nd Street, Suite E
Santa Monica, CA 90405

LISA M. MARTINELLI, ESQ.
Partridge, Snow & Hahn, LLP
180 South Main Street
Providence, RI 02903

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

represented to the Court last week that we will do, is that Mr. Plant was exposed to some of the highest proprietary and confidential information of the company. In order to demonstrate that, we need to show the Court what he was exposed to.

THE COURT: Well, I think what you're going to need to do, then, on an individual basis, is to make that request.

MR. SCOTT: I will, your Honor. Thank you very much.

THE COURT: And then obviously any testimony on that, you may have to ask for the record to be sealed on that.

MR. SCOTT: Thank you.

**KEVIN PLANT, PLAINTIFF'S WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Kevin Plant, P-L-A-N-T.

**DIRECT EXAMINATION**

**BY MR. SCOTT:**

Q. Mr. Plant, in July 2002, you applied for a position at Astro-Med; isn't that correct?

A. Correct.

Q. And at the time of your application, you had three to five years of inside and outside sales experience?

A. Correct.
Q. In fact, in 2002, at the time of your application, you were working for a New Jersey company called Organize-It-All; is that correct?
A. Correct.
Q. And Organize-It-All is a company that sells home organizational products; is that right?
A. Yes.
Q. And they sell them to retailers and catalogers; correct?
A. Yes.
Q. And prior to working for Organize-It-All, you worked for a company that sold ad space for sports publications?
A. Correct.
Q. And as part of your responsibility, you sold souvenirs and memorabilia to national professional sports leagues; correct?
A. Correct.
Q. Like the NBA and the MLB?
A. Yes.
Q. And prior to that, in the late Nineties, you worked for a Rhode Island company selling consumer products, such as watches and pens?
A. Correct.

Q. And at the time of your application to Astro-Med in July 2002, you were living in New Jersey; is that correct?
A. Yes.
Q. And you had no experience as of July 2002 in marketing or selling medical equipment; isn't that right?
A. Correct.
Q. You had no experience selling neurophysiological equipment?
A. Yes.
Q. Neurophysiological equipment, we can agree, includes electroencephalographs?
A. Yes.
Q. Which we can abbreviate to EEG?
A. Yes.
Q. And polysomnographs?
A. Correct.
Q. Which we can abbreviate to PSG?
A. Yes.
Q. And long-term epilepsy monitoring equipment?
A. Yes.
Q. No experience selling that medical equipment at all?
A. No.

A. Yes.
Q. You were hired with the start date of October 16th?
A. Correct.
Q. And on the date of your hire, you signed an employment agreement with the company, did you not?
A. Yes.
Q. I turn your attention to Exhibit 4, please. It's the document entitled Astro-Med, Inc., Employment Agreement. Is that your signature on the second page, sir?
A. Yes, it is.
Q. And it's dated October 16th, 2002?
A. Correct.
MR. SCOTT: Your Honor, I offer Exhibit 4 as a full exhibit.
THE COURT: Any objection?
MR. KARCIS: No objections, your Honor.
THE COURT: Four is full.
(Plaintiff's Exhibit 4 was admitted in full)
Q. And you signed that agreement on October 16th prior to receiving any salary from Astro-Med; isn't that correct?
A. Correct.
Q. And you signed that agreement prior to receiving

any training from Astro-Med in selling Grass's EEG, PSG and long-term monitoring equipment; correct?

A. Yes.

Q. And you signed that agreement prior to being exposed to any customers of Astro-Med; correct?

A. Yes.

Q. Or prospective customers?

A. Correct.

Q. Or Astro-Med's internal pricing methodology?

A. Correct.

Q. Or products in research and development at Astro-Med?

A. Yes.

Q. In fact, signing the employee agreement was a condition of your employment with the company?

A. Yes.

Q. And in exchange for your employment with the company and your salary, you made several agreements with the company as reflected in that employee agreement, did you not?

A. Yes.

Q. You agreed to protect the integrity of Astro-Med's confidential and proprietary information, didn't you?

THE COURT: Mr. Scott, your document's in. It speaks for itself. Let's move it ahead.

histories with Miss Hawes?
A. Yes.
Q. And bills of material?
A. Correct.
Q. And supply/demand inquiries?
A. Yes.
Q. Credit histories?
A. Yes.
Q. Price checks?
A. Correct.
Q. Tech support issues?
A. Correct.
Q. And customer support issues?
A. Yes.
Q. And as part of your training at Astro-Med, you were also sent on installations throughout the United States with respect to the EEG, PSG and long-term monitoring equipment that Astro-Med sells; correct?
A. Yes.
Q. In fact, at your six-month review, you were encouraged to attend more on-site EEG, PSG and long-term monitoring installations; correct?
A. Yes.
Q. Because that was of value to you as a product

specialist, to have an excellent understanding as to the capabilities, all facets of Astro-Med's medical equipment; correct?

A. Yes.

Q. Because one of your job responsibilities was, in fact, to train the salespeople in the field?

A. Yes, if needed.

Q. And you, in fact, did that. You did travel more?

A. Correct.

Q. And attended installations at Astro-Med's customers throughout the country?

A. Yes.

Q. And you were also encouraged at your six-month review to visit with salespeople as demonstrations of products were being conducted; correct?

A. Yes.

Q. And you were encouraged to make several more visits throughout the remainder of that year?

A. I believe so, yes.

Q. Because, like installations, having an excellent working knowledge of how the products are sold was critical to your success as a product specialist at Astro-Med; correct?

A. It was part of the job description.

Q. Did you ever go to Astro-Med's facility in

Braintree for training?
A. I don't recall.
Q. Now, as part of your responsibilities as a product specialist to train salespeople throughout the United States, you also had to work with the sales and engineering departments; correct?
A. On occasion.
Q. And part of your interface, let's call it, with the engineering group was to assist them in the development of new products; isn't that right?
A. Yes.
Q. In fact, at your one-year review, you were applauded for having an excellent relationship with the technical group at Astro-Med. Do you recall that?
A. Yes.
Q. And you were very involved with the testing and implementation of the TWin 3.X software under development, weren't you?
A. Yes. I was asked to test it at my desk or run through it.
Q. You tested it at your desk, and you provided feedback and comments to the engineering group; correct?
A. Correct.
Q. When I say 3.X, you understand that as being what

we would call an Alpha and/or a Beta software program, software that's under development, correct, before release?

A. Yes.

Q. And as a further part of your training, the company paid your tuition towards receiving your college degree, didn't it?

A. Yes, the few courses I took.

THE COURT: What was that?

THE WITNESS: The few courses that I took.

THE COURT: What were the courses in?

THE WITNESS: They were generic courses for a Bachelor of Science in health administration.

THE COURT: What were they?

THE WITNESS: I'm not sure, your Honor. I don't recall. That was two or three years ago.

THE COURT: Where did you take them?

THE WITNESS: University of Phoenix online.

THE COURT: They were online courses?

THE WITNESS: Yes.

Q. And at your one-year review, you were further encouraged to make additional trips at installs with the tech people and demonstrations with the salespeople at customer sites throughout the country; correct?

A. Yes.

Q. And you did it?
A. On occasion, when asked.
Q. And as you became more experienced and knowledgeable with the Astro-Med products and product line, you were given increasing responsibility, were you not?
A. I wouldn't say increasing responsibility. I was just given the responsibility to do what my job description was.
Q. But you came to Astro-Med not knowing anything about its product line; correct?
A. Correct.
Q. And then after -- between six months and a year, you were interfacing with engineering and working to develop new products and software for the company; correct?
A. I wouldn't say I was helping develop it. I would say I was helping troubleshoot. I'm not an engineer, so I don't develop products.
Q. Well, troubleshooting is part of the development of products, isn't it?
A. Okay.
Q. Wouldn't you agree with that?
A. Yes.
Q. In fact, you were placed in a position of

Q. And you believed that they had very well-respected products; correct?
A. Yes.
Q. And after a couple of years as a product specialist, a vacancy became available in the southeast region for a district manager; correct?
A. Correct.
Q. And at the time the southeast territory included Florida, Georgia, South Carolina and Alabama; is that correct?
A. Correct, and Tennessee.
Q. And because of your success as a product specialist, the company promoted you to district manager of the southeast region; correct?
A. I actually went looking for the job.
Q. You did?
A. It wasn't a direct promotion from management. I had asked for the job.
Q. You requested it, you requested a promotion, and the company gave you the promotion; correct?
A. After some discussion, yes.
Q. And the company paid your relocation expenses to move from Rhode Island to Florida; correct?
A. Correct.
Q. In excess of, what, $15,000?

A. Yes.
Q. And that product was not launched at the time you left Astro-Med?
A. Not to my knowledge.
Q. And those all were considered by the salespeople, including you at the time, to be major enhancements to meet the competitive pressures of the marketplace?
A. Yes.
Q. Now, in 2006, you had approximately four years of training and experience in the EEG, PSG and long-term monitoring medical equipment, did you not?
A. Yes.
Q. And, in fact, in 2006, you were compensated over three times what you made as a salesman before you arrived at Astro-Med?
A. Yes.
Q. In fact, during the first nine months of 2006, you were making approximately $124,000 as the district manager/salesperson at Astro-Med, weren't you?
A. I believe so.
Q. Selling equipment you had no idea what they were or how they ran back in July of 2002 when you first applied for the job; correct?
A. Correct.
Q. And because of the training and experience that

Q. Let me turn your attention to Exhibit 13. That's a September 22nd e-mail from you to Mr. Pizzuti?
A. Yes.
Q. Take a moment to read that, sir.
(Witness peruses document)
Q. Is that a true copy of your e-mail to Mr. Pizzuti?
A. Yes.
MR. SCOTT: Offer that as a full exhibit, your Honor.
THE COURT: Any objection to 13?
MR. KARCIS: No, your Honor.
THE COURT: Thirteen is full.
(Plaintiff's Exhibit 13 was admitted in full)
Q. Mr. Plant, you were aware of the employment agreement as of September 2006?
A. Yes.
Q. Were you ever not aware of your employment agreement with Astro-Med?
A. No, I was aware.
Q. And you indicated that you consulted a lawyer?
A. Yes.
Q. Who did you consult?
A. The attorneys for Nihon Kohden.
Q. It wasn't your personal lawyer?
A. No.

work for more than one company, but this friend was an employee of Kohden; correct?

A. Correct.

Q. And you were an employee of Astro-Med?

A. Correct.

Q. You were charged with selling only Astro-Med products; correct?

A. Correct.

Q. When did you have that discussion with your friend from Kohden with respect to possible employment opportunities with that company?

A. I don't recall the date.

Q. Well, can you approximate for us, please.

A. Beginning of September.

Q. And did you interview at Kohden?

A. No. We spoke in Florida.

Q. Who is "we"?

A. Myself and the sales representative there and the national sales manager or if you want to call him the national sales manager of Kohden.

Q. And what is his name or her name?

A. His name is Gary Reasoner.

THE COURT: Was that a face-to-face meeting?

THE WITNESS: It was a face-to-face meeting with the gentleman Brian Keogh, who was a friend and a Nihon

Kohden representative, Nihon Kohden sales. Gary Reasoner was the phone conversation. He's the national sales manager for Nihon Kohden.

THE COURT: Okay.

Q. And you never met with Mr. Reasoner?

A. I did.

Q. Prior to hire?

A. Yes.

Q. And did you advise Mr. Reasoner of your employment agreement with Astro-Med?

A. I did.

Q. At the time of your initial meeting with him or prior?

A. Prior.

Q. And did he say that that would not be an impediment to hiring you?

A. No. He said, We'll have the attorneys look at it.

Q. And ultimately they made you an offer?

A. Upon review of the document, but yes.

Q. They made you an offer with full knowledge of the document and the restrictions?

A. Yes.

Q. And did Mr. Reasoner advise you that there was a risk that a Court would enforce the terms of the employment agreement and you would not be permitted to