# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.A. NO. 06-533ML

ASTRO-MED, INC.

VS. APRIL 3, 2008
9:30 A.M.

KEVIN PLANT, et al

* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE PLAINTIFF: STACEY P. NAKASIAN, ESQ.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903

FOR THE DEFENDANTS: BRUCE W. GLADSTONE, ESQ.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

E.P. MICHAEL KARCIS, ESQ.
McLean & McLean LLP
3001 2nd Street, Suite E
Santa Monica, CA 90405

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

Q. And what did you think about it when you saw it?
A. It was in legalese I didn't understand, so I actually -- I had my brother-in-law, who is an attorney, I said, Can you take a look at this for me.
Q. Now, you said that you were going to be applying or you had applied to a couple of companies?
A. Yes.
Q. What companies?
A. G.E. Medical --
MS. NAKASIAN: Objection. Relevance.
THE COURT: Sustained. Why is this even relevant?
MR. KARCIS: It has to do with his understanding of the agreement, your Honor, where he could work based upon his understanding, what he told especially -- he did eventually work for Nihon Kohden.
THE COURT: Well, all of that, other than what he told Nihon Kohden, is irrelevant. So let's get to it.
Q. Well, why did you start looking around for a job at that time?
A. I was notified that the -- after two-and-a-half years and being the number-two sales rep that my territory was going to be cut substantially.
Q. And how many jobs did you interview for?

A. Three. Sorry, four.
Q. Was one of them Nihon Kohden?
A. Yes.
Q. And in the chronology of it, where did Nihon Kohden fall, first or fourth or somewhere in between?
A. They were fourth.
Q. The prior three jobs, were they offers you did not take?
MS. NAKASIAN: Objection. Relevance.
THE COURT: Overruled. It's a yes or no.
A. I'm sorry, could you repeat the question.
Q. Did the prior interviews result in offers you did not accept?
A. No. There weren't any offers.
Q. And do you know why there weren't any offers?
MS. NAKASIAN: Objection, your Honor.
THE COURT: Sustained.
Q. Were any of the prior -- strike that. Did you eventually interview with Nihon Kohden?
A. Yes.
Q. And in your interview with Nihon Kohden, did you provide them with a copy of Exhibit 3?
A. Yes.
Q. Did you talk to them -- did you talk to anyone at Nihon Kohden about your opinions concerning Exhibit 3?

Astro-Med.

Q. And over the course of time working with Astro-Med, you became friends with him as well?

A. Yes.

Q. And after you left Astro-Med, did you have any contact with Mr. Crawford?

A. Yes.

Q. And what was the initial contact you had with him?

A. I was at a trade show in Jacksonville, and he approached me and didn't know I had left Grass and was surprised where I went, and he wanted to -- he was curious about our product.

MS. NAKASIAN: Objection. Move to strike.

THE COURT: Sustained. It may be stricken. The jury will disregard.

MR. KARCIS: The entire response?

THE COURT: Everything after "yes."

Q. When was it that you first saw him after you left Astro-Med?

A. It was November of '06.

Q. And what was the situation in which you saw him?

A. It was a trade show with all neurology products in Jacksonville.

Q. And you were there on behalf of what company?

A. Nihon Kohden.

Q. And this is before that e-mail we mentioned earlier; correct?
A. Correct.
Q. Did something happen that caused you to send that e-mail on December 3rd?
MS. NAKASIAN: Objection.
THE COURT: Yes or no.
A. Yes.
Q. And what was that?
MS. NAKASIAN: Objection.
THE COURT: Sustained.
MR. KARCIS: It goes to a state of mind and action.
THE COURT: I've sustained the objection. Move on.
Q. Was that e-mail your initial conversation with Mr. Crawford about Nihon Kohden equipment?
MS. NAKASIAN: Objection.
THE COURT: Sustained.
Q. When you met with Mr. Crawford at the Jacksonville trade show, again, that was the first time you saw him after you left Astro-Med; correct?
A. Correct.
Q. Did Mr. Crawford at that trade show take any literature regarding Nihon Kohden?

A. I believe he might have taken some.
Q. Did Mr. Crawford contact you again to request any sales information from you?
MS. NAKASIAN: Objection.
THE COURT: Sustained.
Q. Did Mr. Crawford -- well, did you ever show Mr. Crawford any Nihon Kohden equipment other than possibly at the trade show?
A. No. It was only at the trade show.
Q. But in the e-mail that was discussed earlier, you had offered to show him some of that equipment; correct?
A. Correct.
Q. And what came of that offer?
MS. NAKASIAN: Objection.
THE COURT: Sustained as to form.
Q. You made that offer. Did you ever go through with that offer?
A. No.
Q. Why?
MS. NAKASIAN: Objection.
THE COURT: Approach.
(Bench conference held on the record)
MS. NAKASIAN: He's trying every which way from Sunday to get what Mr. Crawford told Mr. Plant.

THE COURT: He's avoiding hearsay. I'll sustain the objection. Step back.

(End of bench conference)

MR. KARCIS: I'm sorry, is it all right if I ask the court reporter to read the last question so I don't repeat that question?

THE COURT: The last question was why.

MR. KARCIS: Okay.

THE COURT: And I sustained the objection.

MR. KARCIS: Correct.

Q. To your knowledge, did anyone from Nihon Kohden contact Mr. Crawford regarding any Nihon Kohden equipment after December 3, 2006?

A. No.

Q. And you did not personally do so; correct?

A. Correct.

Q. To your knowledge, did anyone after December -- well, strike that. Since December 3, 2006, through December 2007, were you involved in demonstrating, quoting or selling any Nihon Kohden equipment to Mr. Crawford?

A. No.

Q. To your knowledge, was anybody else at Nihon Kohden?

A. To my knowledge, no.

Q. There's a reference at the top of the document.
A. Yes.
Q. Is that the name of the customer, sir?
A. That's the doctor's business, yes.
Q. And would you pronounce that for me, please.
A. Osceola Neurology.
Q. What conversations did you have with Osceola Neurology, if any, prior to January 9 or, I'm sorry, let's say between October 2006 and January 9, 2007?
A. I don't recall any specifics. I believe they might have called in and I said I can't -- I can't help you.
Q. Well, let's ask that, then. From -- if you turn to Exhibit 37, please. If you look on the first page of that exhibit, we have a date of December 28th, sir. Do you see that?
A. Yes.
Q. From December 28th to February 16, 2007, did you have any contact with any potential customers in Florida regarding the sale of EEG, PSG or LTM equipment?
A. No.
Q. If you turn, sir, to Exhibit 39, the small binder.
MR. KARCIS: For the record, my objection regarding the admission of that document is withdrawn.

Q. And before you signed them -- well, strike that. Your purpose in signing them was to confirm that they were true and accurate to the best of your knowledge; correct?
A. Correct.
Q. And you read the responses before you signed them, didn't you, sir?
A. I read and tried to understand as much as I could.
Q. And did you understand in Interrogatory Number 6 we were asking you to identify the customers to whom you had sold product in Florida on behalf of Nihon Kohden?
A. Yes.
Q. And do you see in response that you objected to providing that information to us?
A. Yes.
MS. NAKASIAN: May I approach, your Honor?
THE COURT: You may.
Q. But your testimony is, although you objected, you gave that information to your counsel; is that correct?
A. Correct.
Q. And did you learn subsequently that the Court ordered that information to be produced to Astro-Med?
A. Yes.
Q. And, in fact, you submitted a supplemental

interrogatory response answering the question that you'd previously objected to; correct?

A. Correct.

Q. And at that time you also produced documents to Astro-Med's counsel regarding your sales in Florida; correct?

A. Correct.

Q. Could you turn in the -- there are two binders next to you, but I'm going to ask you to turn to Exhibit 36, which is in the big binder. I have a copy of Exhibit 36, also. Are those the documents you produced to us when the Court ordered you to respond to our request for information about your sales in Florida?

MR. KARCIS: Objection, your Honor.

THE COURT: Basis?

MR. KARCIS: Attorney work product.

THE COURT: Overruled.

MR. KARCIS: Attorney/client privilege as well, your Honor.

THE COURT: Overruled.

A. Yes, I provided those documents.

Q. And do you recall in answering Interrogatory Number 6, which I read earlier, the one where we asked you to identify the sales you made in Florida on behalf

of Nihon Kohden, that in your supplemental answer which you gave us in January of 2008, that you referred us to this set of documents? Do you recall that?
A. I don't recall.
MR. KARCIS: Objection, your Honor. Speculation, attorney work product, attorney/client.
THE COURT: Overruled.
MS. NAKASIAN: Your Honor, may I approach the witness?
THE COURT: You may.
Q. Mr. Plant, do you recognize that as the supplemental interrogatory response that you signed in January 2008?
A. Yes.
Q. And could you just confirm, sir, that your signature is on that document.
A. Yes.
Q. And, again, you signed that document under oath; correct?
A. Correct.
Q. And before you signed that document confirming to us the accuracy of those interrogatory responses, you read them to make sure they were true and accurate, didn't you?
A. Yes.

Q. And in response to Interrogatory Number 6 asking for information about sales, you referred us to the documents you produced at the same time as that answer; correct?

MR. KARCIS: Objection. Speculation, attorney/client privilege, work product doctrine, your Honor.

THE COURT: Overruled.

A. I'm sorry. Could you repeat the question for me.

Q. Yes. When you answered Interrogatory Number 6 in January of 2008, rather than listing the customers to whom you had sold, you referred us to the documents that you were producing with the interrogatory response; correct?

MR. KARCIS: Same objections, your Honor.

THE COURT: Same ruling.

A. I'm not sure how to answer that. I didn't refer you to the documents because there's a list of customers included in this document that seems like it would answer Interrogatory Number 6.

Q. Sir, is there a list of customers in response to Interrogatory Number 6?

A. It's stated in this document there is.

Q. Mr. Plant, maybe I can help you by reading your response to Interrogatory Number 6. Maybe that will

help you answer my question. This was your response to Interrogatory Number 6, Interrogatory Number 6, which asked you to identify all customers to whom you have sold EEG, PSG and LTM equipment from October 1, 2006, to the present within the state of Florida.

Your response was as follows, and this is the one you signed: "The responding party incorporates his objections in his initial response to this interrogatory. Without waiving those objections and in full compliance with the Court's December 5, 2007, ruling and subject to the December 27, 2006, protective order between the propounding and responding parties limiting access to attorneys for the parties' eyes only, the responding party supplements his response as follows. The documents provided by Defendant Kevin Plant's Supplemental Response to the Plaintiff's First Request for Production of Documents Number 4 which are incorporated herein and are made a part hereof by reference are responsive to this interrogatory."

Did I read that accurately?

A. Yes.

Q. So when we asked you to list your customers, you referred us to the documents that you had produced; correct?

A. I'm sorry, I'm still unclear if it -- because I'm

looking at this interrogatory that has a list of accounts on here.

Q. Mr. Plant, I'm not asking you about Interrogatory Number 3, which is a different question. I'm asking you about Interrogatory Number 6.

A. Then yes.

Q. Thank you. I want to ask you some questions about how you put quotes together for customers in your territory. I understand from prior testimony that -- well, let me just ask you. When you have a prospect for a sale in Florida, you, I take it, gather as much information about that prospect's need for the equipment you sell; is that correct?

MR. KARCIS: Objection, your Honor.

THE COURT: Basis?

MR. KARCIS: Vague as to time, overly broad, incomplete hypothetical.

THE COURT: Set a time, please, or for whom he's working.

MS. NAKASIAN: Certainly, your Honor.

Q. I'm speaking now and for all of these questions I'm talking about your activities on behalf of Nihon Kohden as their sales representative in Florida in 2000 -- after October 2006. Okay?

When you're working in your capacity as a

A. Yes.
Q. And you also understood that the order prohibited you, I'm reading from paragraph 2, prohibited you from disclosing, quote, "any proprietary or confidential information acquired during your employment at Astro-Med, Inc., including research and development information, customer and prospect lists and pricing strategies." You understood that prohibition, didn't you, sir?
A. Yes.
Q. But, in fact, you did offer to sell such products in Florida while that order was in effect, didn't you?
A. No.
Q. Mr. Plant, could you turn to Exhibit 38. Do you recognize that document?
A. Yes. That was sent to me.
Q. I'm sorry?
A. It was a quotation that was sent to me.
Q. It's a quotation that was among the quotations you provided to me in response to the judge's order compelling you to produce records of consummated sales; correct?
MR. KARCIS: Objection, your Honor. Argumentative and misleading, also attorney/client privilege, lacks foundation and work product doctrine.

THE COURT: Overruled on those grounds. However, Ms. Nakasian, I'm going to ask you to rephrase the question. I think it was more consistent with the interrogatory.

MS. NAKASIAN: Thank you, your Honor. I will rephrase it.

Q. Mr. Plant, we started off this morning by looking at the interrogatory response asking you for information about the sales you made in Florida for Nihon Kohden; and you confirmed that in answering that interrogatory, you referred us to this set of documents that has been marked as Exhibit 36.

And I'm asking you now whether you're aware, you recall that the document that I've marked as Exhibit 38 is one of the quotes contained in Exhibit 36.

A. Yes, that quote is in Exhibit 36.

MS. NAKASIAN: Your Honor, I move to admit Exhibit 38.

MR. KARCIS: Objection, your Honor. Lacks foundation.

THE COURT: Overruled. It's full.

MS. NAKASIAN: Thank you.

(Plaintiff's Exhibit 38 was admitted in full)

Q. Mr. Plant, that is a quote -- excuse me. Let me make sure the jury can see the top part. That document

says in the upper right-hand corner that it has a quotation date of January 9, 2007; correct?

A. Correct.

Q. You'll agree with me, sir, that was within the period that the Court's order that's been marked as Exhibit 37 was in effect; correct?

A. Correct.

Q. And can you tell me -- well, strike that. This is a quote to Osceola Neurology in, I may not pronounce it right, Kissimmee, Florida?

A. Yes.

Q. And it's a quote for EEG equipment; correct?

A. Correct.

Q. Total offer of $11,950 worth of equipment and related supplies; correct?

A. Correct.

Q. In the upper right-hand corner under the quotation date it reflects your name, Kevin Plant, as the salesperson; correct?

A. Yes.

Q. Mr. Plant, can you look at Exhibit 39. Do you recognize that as one of the documents you referenced in response to the interrogatory where we asked you about your consummated sales in Florida?

MR. KARCIS: Same objection, your Honor.

THE COURT: If you leave out the word "consummated," I think you're okay.
Q. Mr. Plant, do you recognize that as one of the documents included in the set of documents you referenced in response to our interrogatory asking you for information about sales you made in Florida?
MR. KARCIS: Same objections, your Honor.
THE COURT: Overruled.
A. Yes.
MS. NAKASIAN: I'd move to admit Exhibit 39 in full.
MR. KARCIS: Lacks foundation, your Honor.
THE COURT: Overruled.
(Plaintiff's Exhibit 39 was admitted in full)
Q. That's a quotation from Nihon Kohden dated January 31, 2007; correct?
A. Correct.
Q. And on January 31, 2007, the Court's order prohibiting you from selling EEG equipment in Florida was in effect; correct?
A. Yes.
Q. And this is a quote to Capital Regional Medical Center in Tallahassee, Florida?
A. Yes, it is.
Q. And it is for equipment including EEG equipment;

correct?
A. Yes.
Q. And you are listed as the salesperson on that quote, are you not?
A. Yes.
Q. In fact, your extension is provided to the potential customer; is that correct?
A. Correct.
Q. So they could reach you if they had any questions?
A. Correct.
Q. And that quote total is over $31,000?
A. Correct.
Q. Can you turn to Tab 40. Mr. Plant, do you recognize that as one of the quotations that were included in the set of documents you referenced in your interrogatory response answering our question asking you for information about sales you made in Florida for Nihon Kohden?
MR. KARCIS: Objection, your Honor.
THE COURT: Overruled.
A. Yes.
MS. NAKASIAN: Your Honor, I move to admit Exhibit 40 in full.
MR. KARCIS: Objection, your Honor.
THE COURT: Overruled.

(Plaintiff's Exhibit 40 was admitted in full)

Q. And that's a quote from Nihon Kohden to Florida Hospital Ormond in Ormond Beach; is that correct?

A. Correct.

Q. And although there seems to be some missing information on the first page, could you -- this is a two-page quote; correct?

A. No. This looks like two different ones, the same --

Q. Sir, do you see at the bottom of the first page of the exhibit it says page 1 of 2?

A. Yes.

Q. The second page says page 2 of 2?

A. Yes.

Q. So this is a two-page quote, isn't it?

A. Correct.

Q. And the second page of that quote reflects a quotation date of February 8, 2007; correct?

A. Correct.

Q. That also is within the term covered by the Court's order prohibiting you from selling EEG, PSG and LTM machines in Florida; correct?

A. Correct.

Q. And the salesperson indicated on this quote is you; correct?

A. Correct.
Q. And this quote is for a total of $48,000; correct?
A. Yes.
Q. Now, you're aware that the Court modified its order after some further proceedings and that that modified order was issued on February 16, 2007?
A. Yes.
Q. And essentially the modified order said you could sell in Florida, you could sell those products in Florida, but not to customers on Astro-Med's customer list; correct?
A. Correct.
Q. And the Court defined what Astro-Med's customer list -- what the Court was referring to when it said Astro-Med customer list; correct?
A. Yes.
Q. And it included prospects that had been provided to you by Astro-Med; correct?
A. Correct.
Q. And do you recall the Court, so there would be no confusion, required Astro-Med in compliance with its order to provide you with a list of those customers and prospects; correct?
A. Correct.
Q. So you would know who's off base; right?

A. Yes.
Q. And that's one of the sales you made in 2007 on behalf of Nihon Kohden?
A. Yes.
Q. Was Coral Gables listed on the Astro-Med customer list?
A. No.
Q. Approximately how much in commissions did you earn in 2007?
A. I can estimate maybe three or four thousand.
Q. Three or four thousand dollars?
A. Yes.
Q. That's not based on three or four thousand dollars of sales; correct?
A. No.
Q. Approximately how much is that in sales?
A. Approximately almost 300,000.
Q. Of total sales for that entire year?
A. Yes.
Q. That you received commissions for?
A. Yes.
Q. Can you turn to the next document. It's marked as D-2. Would you look at those four pages, sir. Do you recognize those pages, sir?
A. Yes.

Q. You talked about affidavits regarding your compliance with the injunction order. Do you recall that, sir?
A. Yes.
Q. And in those affidavits, do you recall them stating that, to the date at the time you signed the affidavits, you've not contacted any customers listed on the Astro-Med customer list?
A. Yes.
Q. Were those affidavits accurate when you executed them?
A. Yes.
Q. As of today's date, do they remain accurate?
A. Yes.
MR. KARCIS: May I approach the witness with Exhibit D, proposed Exhibit D?
THE COURT: Does counsel have Exhibit D?
MR. KARCIS: Yes, your Honor.
MS. NAKASIAN: Are we saying D?
THE COURT: D.
MS. NAKASIAN: I have D, what we received today. Yes. Thank you.
Q. The documents I've handed you, sir, have been marked as Exhibit D. Generally, sir, do you recognize the documents that are marked as Exhibit D?

Q. And you get paid a commission on the sales in your territory; correct?
A. Yes. There's a percentage on items sold.
Q. What is that commission range?
A. It varies on how much you discount the item and what items are sold.
Q. And how often are your commissions paid to you over the course of a year by Nihon Kohden?
A. They are paid monthly as to if the orders have come in or if the orders have shipped out.
Q. And when you're paid that commission from Nihon Kohden, do they provide you with some sort of report or accounting of how that commission was calculated?
A. I believe there's a green bar graph that they provide to you and tell you what items have shipped out, what's on backorder and percentage of commission.
Q. Okay. So they give you a graph. Does it include information about what sales are included in the graph?
A. It pertains to what sales -- what is shipped out to the Florida territory.
Q. Does the report actually show you the specific sales that the commission's being calculated on?
A. Yes.
Q. Is that in some sort of listing form?
A. I believe so, yes.

Q. And you get that monthly?
A. That graph comes out -- I believe I only received it twice last year.
Q. And what if for some reason a sale occurs in your territory as a result of an effort of a salesperson elsewhere for Nihon Kohden, do you still get paid a commission on that?
A. It depends. If the item is something that I could sell, then usually we'd split a commission with an outside rep from another territory.
Q. Now, you were asked in the course of these proceedings by Astro-Med a series of questions called interrogatories, and you answered those. Do you recall that?
A. I don't recall the exact questions.
Q. But you recall being provided with a set of questions, providing answers and confirming those answers; is that correct?
A. I believe so.
Q. And one of the questions you were asked to answer, a question put to you by Astro-Med, was the question asking you to identify all customers to whom you have sold EEG, PSG and LTM equipment from October 1, 2006, when you joined Nihon Kohden to the present in Florida. Do you recall being asked that question?